FILED
JUL 17 2013
U. S. DISTRICT COURT
E. DIST. OF MO.
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,   )
                            )
        Plaintiff,          )
                            )       No. 4:13CR00300HEA
v.                          )
                            )
MEL E. LUCAS, D.O.,         )
ROBYN LEVY, A.N.P., and     )
PATTERSON MEDICAL CLINIC, INC., )
                            )
        Defendants.         )

### INDICTMENT

The Grand Jury charges that:

### COUNTS 1-3
### HEALTH CARE FRAUD SCHEME
### 18 U.S.C., §§1347(a)(1) and 2
### Fraudulent Billing For X-Rays

### INTRODUCTION

1.   At all times relevant to this indictment, defendant Mel E. Lucas, D.O, was a doctor of osteopathic medicine, licensed to practice in the state of Missouri.

2.   At all times relevant to this indictment, defendant Patterson Medical Clinic, Inc. (Patterson Medical) was located at 2175 Charbonier in Florissant, Missouri. Dr. Lucas is the owner of Patterson Medical and the only doctor practicing at Patterson Medical.

3.   Dr. Lucas has been an approved Medicare provider since 2001 and an approved TRICARE provider since January 1, 2005. Dr. Lucas has also been a provider for several private insurance companies, including Anthem Blue Cross Blue Shield and Blue Shield of Missouri (Blue Cross).

4.      Defendant Robyn Levy is a licensed adult nurse practitioner (A.N.P), who has worked at Patterson Medical since about 2002. Defendant Levy has a master's degree and a doctorate degree.

### Relevant Medicare Provisions

5.      The Medicare Program is a federal health benefits program for the elderly and disabled. The United States Department of Health and Human Services (HHS), through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program. CMS acts through fiscal agents, which are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries.

6.      As part of the application process, Dr. Lucas signed a CMS-8551 form that informed him of the penalties for falsifying information to gain or maintain enrollment in the Medicare program as well as penalties for falsifying information when seeking reimbursement from the Medicare program. The following notice was included:

> 18 U.S.C. 1347 authorizes criminal penalties against individuals who knowing and willingly execute or attempt, to execute a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the control of any, health care benefit program in connection with the delivery of or payment for health care benefits, items, or services. . . .

7.      The CMS-8551 form signed by Dr. Lucas also contained a Certification Statement that provided: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

2

8. After the successful completion of the application process, Dr. Lucas was assigned a unique provider number, which is a necessary identifier for billing services to Medicare.

9. Medicare providers must retain clinical records for the period of time required by state law or five years from date of discharge if there is no requirement in state law. Missouri statutes require that physicians maintain patient records for a minimum of seven years from the date when the last professional services were rendered. Thus, Missouri law mandates that the defendants maintain all patient records for services provided from 2006 to the present.

### Relevant Tricare Provisions

10. TRICARE is a federal health benefits program for military personnel and their families. TRICARE contracts with private health plans to administer benefits for medical services that take place outside military medical facilities.

11. TRICARE polices and benefits are governed by public law and federal regulation. Contracted TRICARE providers are obligated to abide by the rules, procedures, policies and program requirements as specified in the TRICARE Provider Handbook.

### Blue Cross

12. Blue Cross Blue Shield is a private health insurance company that reimburses physicians, advanced practice nurses, and other health care providers for specified services to persons whom the company insures.

### Current Procedural Terminology (CPT) Codes

13. In presenting reimbursement claims to Medicare, TRICARE, and health insurance

3

companies, health care providers use numeric codes, known as "CPT Codes," to describe the service they provide. The CPT codes are contained in Physicians Current Procedural Terminology manual. The CPT manual is published by the American Medical Association (AMA) and its body of physicians of every specialty, who determine appropriate definitions for the codes. By submitting claims using these CPT codes, providers represent to the insurance companies and their patients that the services described by the codes were, in fact, provided.

14. Reimbursement rates for the CPT codes are set through a fee schedule, which establishes the amount that the provider will be paid for a given service, as identified by the CPT code.

## DESCRIPTION OF HEALTH CARE FRAUD SCHEME

15. Patterson Medical has its own radiologic/x-ray equipment in its offices and employs technicians who take x-rays of Patterson Medical's patients. From about June 2008 to about June 2011, the defendants billed Medicare, TRICARE, and private insurers for more x-rays than actually taken.

16. It was part of the scheme and artifice to defraud that the defendants routinely took one x-ray of the sinuses and then used CPT code 70220, to falsely indicate in the reimbursement claim that a minimum of three x-rays of the sinuses had been taken. CPT code 70220 is defined as: "Radiologic examination, sinuses, paranasal, complete, minimum of 3 views." One view is one x-ray.

17. It was part of the scheme and artifice to defraud that the defendants took two x-rays of the knee and used CPT code 73564, to falsely indicate in the claim for reimbursement

that four or more x-rays of the knee were taken. CPT code 73564 is defined as: "Radiologic examination, knee, complete, 4 or more views."

18. X-rays are considered part of the patient file and must be maintained at least seven years after the x-ray is taken. However, the patient files maintained by the defendants do not contain the number of x-rays that the defendants billed. Nor do the patient files contain reports indicating that the number of x-rays, which were billed, were actually taken.

19. It was part of the scheme and artifice to defraud that the defendants concealed and did not disclose to Medicare, TRICARE, private insurers, or patients that the defendants had billed more x-rays than taken and had received reimbursement which they were not entitled to receive.

## Execution of the Health Care Fraud Scheme

20. On or about the dates indicated below, in the Eastern District of Missouri,

**MEL E. LUCAS, D.O.
and
PATTERSON MEDICAL CLINIC, INC.,**

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme or artifice to defraud health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted, and caused to be submitted, reimbursement claims to health care benefit programs, which claims falsely represented that the defendants had taken more x-rays than were actually taken.

| Count | Patient | Date of Service | Date of Claim | Insurer |
|---|---|---|---|---|
| 1 | A.D. | 10/26/2009 | 10/29/2009 | Medicare |
| 2 | S.A. | 06/16/2010 | 06/23/2010 | Medicare |
| 3 | K.A. | 04/29/2011 | 05/04/2011 | Medicare |

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

The Grand Jury further charges that:

### COUNTS 4-6
### HEALTH CARE FRAUD SCHEME
### 18 U.S.C. §§1347(a)(1) and 2
### Fraudulent Billing For Evaluation And Management Services

21.    Paragraphs 1-14 are incorporated by reference as if fully set out herein.

22.    It was part of a scheme and artifice to defraud that from in or about 2008 to in or about 2011, the defendants submitted, and caused to be submitted, reimbursement claims that falsely stated that Dr. Lucas personally provided face-to-face evaluation and management services to patients.

23.    The Medicare provider agreement, which Dr. Lucas signed in 2001 and again in 2010, advised him that a doctor may not use his provider number to bill for services provided by his staff unless the doctor is present in the office suite and available to supervise the service. Even with supervision, a doctor may not use his provider number to bill evaluation and management services under CPT codes 99212 through 99215, if a medical assistant provided the services.

24. An advanced practice nurse may apply to become a Medicare or TRICARE provider and obtain a provider number. The advanced practice nurse may then bill under his or her own provider number for evaluation and management services. Medicare and TRICARE will pay an advanced practice nurse 85% of the amount that a physician would be paid for the same service.

25. Blue Cross has a similar policy. In a June 2010 letter to all its providers, Blue Cross confirmed this policy:

> Our policy requires that mid-level practitioners have a contract with Anthem and file claims using their own National Practitioner Identifier (NPI). This policy enables us to track who is actually providing care to our members, and helps ensure that those providers are properly credentialed and reimbursed for their services. During recent claim reviews, we found that many mid-level practitioners providing service to Anthem members have not applied for contracts and are instead filing claims using their collaborating physicians NPI. . . we ask that you refrain from billing under the collaborating physician's NPI for any services provided to Anthem members by a mid-level practitioner.

**Billing While Dr. Lucas Out of the Country or Out of Town**

26. It was part of a scheme and artifice to defraud that from in or about 2008 to in or about 2011, the defendants submitted, and caused to be submitted, false claims under Dr. Lucas' provider number for services purportedly provided by Dr. Lucas when Dr. Lucas was actually out of town or out of the country.

27. Airline and credit card records indicate that Dr. Lucas was in the cities listed below on the dates indicated. Claims submitted for these dates reflect Dr. Lucas' provider number, thereby falsely indicating that Dr. Lucas had personally provided face-to face evaluation and management services to the patients.

7

| | | |
|---|---|---|
| a. | Cabo San Lucas, Mexico, January 15-20, 2008 | 6 Claims |
| b. | Connecticut, October 1-4, 2008 | 13 Claims |
| c. | Cabo San Lucas, Mexico, January 6-17, 2009 | 88 Claims |
| d. | Las Vegas, Nevada, October 2-3, 2009 | 11 Claims |
| e. | Cabo San Lucas, Mexico, January 2-16, 2010 | 139 Claims |
| f. | Madison, Wisconsin, March 26-28, 2010 | 12 Claims |
| g. | Phoenix, Arizona, May 26-30, 2010 | 39 Claims |
| h. | Jackson Hole, Wyoming, September 8-12, 2010 | 43 Claims |
| i. | San Antonio, Texas, November 10-13, 2010 | 40 Claims |
| j. | Miami, Florida, January 3-11, 2011 | 68 Claims |
| k. | Cabo San Lucas, Mexico, March 3-10, 2011 | 78 Claims |
| l. | Cabo San Lucas, Mexico, September 5-11, 2011 | 36 Claims |

**Billing Services of Medical Assistants as Evaluation and Management Services**

28. A doctor may not use CPT codes 99212 or 99213 to bill for evaluation and management services when the doctor is out of the office suite and the only service provided to the patient is an injection or a blood draw by a medical assistant.

29. CPT code 99212 is defined as an:

> Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:
> - A problem focused history;
> - A problem focused examination;
> - Straightforward medical decision making.
>
> Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or

8

family's needs. Usually, the presenting problem(s) are self- limited or minor. Physicians typically spend 10 minutes face to face with the patient or family.

30. CPT code 99213 is defined as:

Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of the 3 key components:
- An expanded problem focused history;
- An expanded problem focused examination;
- Medical decision making of low complexity.

Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

31. The defendants used a form (Treatment Form) to record and document the patient's condition at the time of the office visit, any physical examination conducted, the assessment/diagnosis, and the treatment provided at Patterson Medical. The Treatment Form also identified the person providing the service.

32. At times relevant to this indictment, Dr. Lucas did not work on Fridays. In Dr. Lucas' absence, medical assistants saw patients who came in for injections and to have their blood drawn. The medical assistants indicated on the Treatment Form the patients' vital signs and the blood draw or the injection that they gave. The Treatment Forms and patient files would then be left for Dr. Lucas to review when he returned to the office. The medical assistants were not qualified to perform, and did not perform, physical examinations or do assessments and diagnoses of the defendants' patients.

33. It was part of the scheme and artifice to defraud that upon Dr. Lucas' return to the office, he would falsely indicate in the Treatment Forms that he had actually seen the patient and conducted an examination of the patient.

34. It was part of the scheme and artifice to defraud that from in or about 2008 to in or about 2011, using CPT codes 99212 or 99213, the defendants submitted, and caused to be submitted, false claims under Dr. Lucas' provider number for evaluation and management services, when they knew Dr. Lucas had not provided the services.

### Execution of the Health Care Fraud Scheme

35. On or about the dates indicated below, in the Eastern District of Missouri,

**MEL E. LUCAS, D.O.**
**and**
**PATTERSON MEDICAL CLINIC, INC.,**

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme or artifice to defraud health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted reimbursement claims to health care benefit programs, which claims falsely represented that Dr. Lucas had personally provided face-to-face evaluation and management services to the patients.

| Count | Patient | Date of Service | Date of Claim | Insurer | Location of Dr. Lucas |
|---|---|---|---|---|---|
| 4 | R.D. | 01/11/2010 | 04/11/2011 | Medicare | Mexico |
| 5 | C.K. | 01/13/2010 | 04/11/2011 | Medicare | Mexico |
| 6 | R.D. | 11/11/2010 | 11/17/2010 | Medicare | San Antonio, TX |

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

The Grand Jury further charges that:

## COUNTS 7-10
## FALSE STATEMENTS RELATED TO HEALTH SERVICES EVALUATION & MANAGEMENT SERVICES
## 18 U.S.C. §§1035 (a)(2) and 2

36.  Paragraphs 1-34 are incorporated by reference as if fully set out herein.

37.  As previously stated, the Treatment Form, used by Patterson Medical, is a part of the patient medical file and is used to document the patient's condition on a particular day and the health care services provided on that day. The information on the Treatment Form may affect the assessment, diagnosis, and treatment of the patient in the future.

38.  Dr. Lucas repeatedly made false entries on Treatment Forms for patients who came to Patterson Medical on days when he was out of the office. The entries were made in the sections of the Treatment Form, entitled Review of Systems, Physical Exam, Plan, and Assessment/Diagnosis. Dr. Lucas signed the Treatment Forms containing the false information. Several examples of the false entries are described below.

39.  In a Treatment Form dated October 1, 2008, Dr. Lucas indicated that the ear, nose, throat, and neck inspection of Patient F.W. was normal ("nml"), he/she was in "no acute distress," his/her extremities were "non-tender," and he/she was "oriented x3." Dr. Lucas thereby falsely represented that he had examined the patient on October 1, 2008 when in fact he was in Connecticut and never saw the patient. The only service provided to Patient F.W. on October 1, 2008 was an injection by a medical assistant.

11

40. In a Treatment Form dated January 13, 2010, Dr. Lucas indicated that the ear, nose, throat, and neck inspection of Patient P.M. was normal ("nml") and he/she was in "no acute distress" and was experiencing "no resp. distress." Dr. Lucas further indicated that the patient's abdomen was "soft, non-tender," his/her skin was normal in color, extremities were "non-tender," and he/she was "oriented x3." Dr. Lucas thereby falsely represented that he had examined the patient on January 13, 2010 when in fact he was in Cabo San Lucas, Mexico and never saw the patient. The only service provided to Patient P.M. on January 13, 2010 was a blood draw by a medical assistant.

41. In a Treatment Form dated May 27, 2010, Dr. Lucas indicated that the ear, nose, throat, and neck inspection of Patient K.S. was normal ("nml") and he/she was in "no acute distress" and was experiencing "no resp. distress." Dr. Lucas thereby falsely represented that he had examined the patient on May 27, 2010 when in fact he was in Phoenix, Arizona and never saw the patient. The only service provided to Patient K.S. on May 27, 2010 was a B-12 injection administered by a medical assistant.

42. In a November 10, 2010 Treatment Form, Dr. Lucas indicated that the ear, nose, throat, neck, and pharynx inspection of Patient R.N. was normal ("nml"); and he/she was in "no acute distress" and was experiencing "no resp. distress." Dr. Lucas also indicated that Patient R.N.'s skin was a normal color, his/her extremities were "non-tender," and he/she was "oriented x 3." Dr. Lucas thereby falsely represented that he had examined the patient when in fact he was in San Antonio, Texas and never saw the patient. The only service provided to Patient R.N. on November 10, 2010 was an injection administered by a medical assistant.

43. On a Treatment Form dated January 5, 2011 for Patient R.N., Dr. Lucas made similar false entries, indicating he had examined Patient R.N. On this date Dr. Lucas was in Miami, Florida.

44. On or about the dates indicated below, in the Eastern District of Missouri,

**MEL E. LUCAS, D.O.**
**and**
**PATTERSON MEDICAL CLINIC, INC.,**

the defendants herein, in a matter involving a health care benefit program, knowingly and willfully made, and caused to be made and used, materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries in connection with the delivery of or payment for health care benefits, items, and services, in that Dr. Lucas falsely represented in Treatment Forms that he had provided face to face services to the patients, including a physical examination of the patient, when the defendants knew Dr. Lucas was out of town or out of the country.

| Count | Patient | Date of Treatment Form | Location of Dr. Lucas |
|---|---|---|---|
| 7 | F.W. | 10/01/2008 | Connecticut |
| 8 | P.M. | 01/13/2010 | Cabo San Lucas, Mexico |
| 9 | K.S. | 05/27/2010 | Phoenix, Arizona |
| 10 | R.N. | 11/10/2010 | San Antonio, Texas |

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

The Grand Jury further charges that:

## COUNTS 11-12
## HEALTH CARE FRAUD SCHEME
## 18 U.S.C. §§1347(a)(1) and 2
## BILLING FOR ACLASTA

45.  Paragraphs 1-14 are incorporated by reference as if fully set out herein.

46.  The Food and Drug Administration (FDA) must approve prescription drugs before the drug can be legally sold, distributed, prescribed, or dispensed in the United States. FDA approves the labeling of the drug and a drug is "misbranded" if the drug does not have the label approved by FDA.

47.  The Food, Drug, and Cosmetic Act (FDCA) prohibits the importation of prescription drugs into the United States and also prohibits the re-importation (except by the drug manufacturer) of prescription drugs manufactured in the United States, then shipped to a foreign country, and then re-imported into the United States.

48.  FDA has repeatedly warned that the purchase of prescription drugs from foreign countries may result in the consumption of expired, sub-potent, contaminated, or counterfeit drugs. Further, foreign drugs may be manufactured for sale in non-English speaking countries and therefore the drug label may not contain adequate directions for use by the health care provider or individual consumer in the United States.

49.  Reclast is a prescription drug manufactured by the Novartis Corporation in Switzerland and approved by FDA for sale and use in the United States. Reclast is used to treat patients with osteoporosis and is usually infused intravenously once a year.

50. Aclasta, a prescription drug, is also manufactured by Novartis in Switzerland, but is not approved by FDA for use in the United States and may not legally be imported into the United States. Aclasta is used to treat patients with osteoporosis and is usually infused intravenously once a year.

51. From in or about April 2009 to in or about September 2011, defendants Patterson Medical and Dr. Lucas repeatedly purchased Aclasta online from two Canadian companies, Canada Health Solutions and Global Health Supplies. The defendants paid about $749.00 for each bottle of Aclasta, which is several hundred dollars less than the price of a bottle of Reclast purchased in the United States.

52. Dr. Lucas used his Bank of America/American Express credit card to pay for Aclasta, which was shipped by Parcel Force Worldwide (located in the United Kingdom) to Patterson Medical.

53. On or about April 10, 2013, federal agents recovered ten boxes of Aclasta from Patterson Medical.

54. At all times relevant to this indictment, defendant Robyn Levy was responsible for the intravenous infusion of prescription osteoporosis drugs at Patterson Medical. From in or about 2009 to in or about 2011, defendant Levy infused Aclasta into patients, without informing them that they were receiving a non-FDA approved drug.

55. From in or about 2009 to in or about 2011, defendant Levy falsely stated on Treatment Forms that she had infused Reclast into patients, when the defendants knew the patients had received Aclasta.

56. Medicare, TRICARE, and private insurers will not reimburse for Aclasta because FDA has not approved Aclasta for use in the United States.

57. From in or about 2009 to in or about 2011, the defendants submitted, or caused to be submitted, reimbursement claims to insurers which falsely and fraudulently represented that the patients identified in the claims received Reclast, a FDA approved drug, when the defendants knew the patients had received Aclasta, a non-FDA approved drug. On the claim forms, the defendants used J3488, the code for Reclast, thereby concealing from the insurers and patients that Aclasta was infused.

58. On or about the dates indicated below, in the Eastern District of Missouri,

**MEL E. LUCAS, D.O.,
ROBYN LEVY, A.N.P.,
and
PATTERSON MEDICAL CLINIC, INC.**

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme or artifice to defraud health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted, and caused the submission, of reimbursement claims to health care benefit programs, which claims falsely represented that the patients had received Reclast.

| Count | Patient | Date of Service | Date of Claim | Insurer |
|---|---|---|---|---|
| 11 | C.A. | 07/01/2010 | 07/07/2010 | Medicare |
| 12 | V.F. | 10/28/2010 | 11/03/2010 | Medicare |

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

The Grand Jury further charges that:

## COUNT 13-15
## FALSE STATEMENTS RELATED TO HEALTH SERVICES
## 18 U.S.C. §§1035 (a)(2) and 2
## FALSE STATEMENTS CONCERNING ACLASTA

59. Paragraphs 1-26 and 46-57 are incorporated by reference as if fully set out herein.

60. During times relevant to this indictment, defendant Levy knowingly infused Aclasta, a non-FDA drug, into patients. The bottle containing the drug and box in which the drug was packaged identified the drug as Aclasta. Defendant Levy nonetheless falsely represented on the Treatment Forms that the patients were given Reclast, the FDA approved drug.

61. On or about the dates indicated below, in the Eastern District of Missouri,

**MEL E. LUCAS, D.O.,**
**ROBYN LEVY, A.N.P.,**
and
**PATTERSON MEDICAL CLINIC, INC.,**

the defendants herein, in a matter involving a health care benefit program, knowingly and willfully made, and caused to be made and used, materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries in connection with the delivery of or payment for health care benefits, items, and services, in that the defendants falsely represented in Treatment Forms that the patients had received Reclast, when they knew the patients had received Aclasta.

17

| Count | Patient | Date of Treatment Form |
|-------|---------|------------------------|
| 13    | M.A.    | 12/14/2010             |
| 14    | M.F.    | 01/28/2010             |
| 15    | A.S.    | 03/17/2010             |

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Sections 1035 and 1347 as set forth in Counts 1 through 15, the defendants shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from gross proceeds traceable to the commission of the offense.

2. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

3. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided

without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____

FOREPERSON

RICHARD G. CALLAHAN
United States Attorney

_____

DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney